(10 App. Div. 430.)

### TRUMAN v. LOMBARD et al.

### LOMBARD v. TRUMAN et al.

(Supreme Court, Appellate Division, Second Department.    December 1, 1896.)

1. APPEAL—RULINGS ON EVIDENCE—HARMLESS ERROR.
    A judgment will not be reversed for error in admitting evidence which was not necessary to support the judgment.
2. SALES—RESCISSION BY BUYER—FAILURE OF PAROL CONDITION.
    Where a contract for the sale of bank stock is subject to a parol condition that an examination by the buyer on his return from a journey shall show the bank to be prosperous, as represented by the seller, and the buyer, on his return, finds the bank insolvent, he may rescind his purchase without showing that the bank was insolvent when the contract was made.
3. FALSE REPRESENTATIONS—SUFFICIENCY OF EVIDENCE.
    Evidence that the president of a bank was informed by his son and by the deputy comptroller of the currency, officially, that the bank was embarrassed, and its capital impaired, proves the falsity of statements, afterwards made by him in order to sell his stock, that the bank was doing a good business and had a large surplus.
4. BANKS—NOTICE OF IMPAIRMENT OF CAPITAL.
    The statement, in a letter from the cashier of a bank to the comptroller of the currency, that "our directors have been seriously considering the advisability of taking a part or all of the surplus, and use it in charging off other than A1 assets," does not necessarily indicate that the surplus is lost, or the capital impaired.

Appeal from special term, Westchester county.

Actions by James C. Truman against Benjamin Lombard, Jr., impleaded with others, and by Benjamin Lombard, Jr., against James C. Truman, impleaded with others.    From a judgment in each case in favor of Truman, Lombard appeals.    Affirmed.

Argued before BROWN, P. J., and CULLEN, BARTLETT, and HATCH, JJ.

C. J. Patterson, for appellant.
Eugene Treadwell, for respondent.

BROWN, P. J.    The two above-entitled actions arose out of a single transaction, and the decision upon the appeals before us depend upon the same facts.    The first action was brought to rescind

a contract whereby the respondent, in consideration of the payment to him of $23,000 in cash and the transfer of 572 shares of the capital stock of the State National Bank of Wichita, Kan., agreed to sell and transfer to the appellant a bond and mortgage upon real estate in Westchester county. The second action was brought to foreclose said mortgage, and the same facts which were set forth in the complaint in the first action were pleaded as a defense in the second.

The mortgaged property, prior to May, 1893, was owned by the respondent, and on May 23d of that year he conveyed it to Mrs. Ida D. Sumner, the wife of a real-estate broker, for the expressed consideration of $125,000, and received in payment therefor a bond and mortgage upon the property for the full amount of the purchase money. Thereafter from sales of some of the property payments were made upon the mortgage, and at the time of the exchange between the parties to this action there was unpaid thereon about $116,000. The agreement out of which these actions have arisen was made on February 1, 1894. Subsequently, and on May 3, 1894, the mortgaged property was reconveyed by Mrs. Sumner to the respondent, and at the time of the commencement of this action he was the owner thereof. The bond and mortgage were assigned to the appellant on February 1, 1894, and the sum of $23,000 was on that day paid to the respondent. Ten shares of the stock were transferred to the respondent and 162 shares thereof were by his direction transferred to Serena Truman. Of the balance 370 shares were by the terms of the agreement to be transferred on or before June 15, 1894, and 30 shares were to be held by the appellant as security that certain taxes upon the property would be paid and certain matters affecting the title to a part thereof would be arranged, all of which it was agreed should be done on or before June 15, 1894. Notwithstanding this agreement, the appellant caused all of the stock to be transferred on the books of the bank prior to the appointment of a receiver thereof, as hereinafter stated. The facts alleged by the respondent, upon which he based his demand that the contract should be rescinded, were that he was induced to transfer the bond and mortgage by the false and fraudulent representations of the appellant that the said bank's stock was fairly worth $200 per share, and that the bank was financially sound; that it had a surplus, in addition to its capital stock of $100,000, and was earning an average of $12\frac{1}{2}$ per cent. per annum upon its capital of $100,000. The agreement was entered into on the eve of the respondent's departure for Europe, he having sailed therefor on the following day. About the 6th day of April, 1894, the respondent returned to this country, and very soon thereafter went to Wichita to examine into the condition of said bank. It was then ascertained that it was insolvent, that it had no surplus, and that its capital stock was wholly gone. In the month of May following it passed into the hands of a receiver, and thereafter an assessment of 100 per cent. was levied upon the capital stock for the purpose of discharging its debts to the depositors therein. Immediately after the respondent ascertained the condition of the bank,

he notified the appellant that he would not accept any further transfer of the stock, and offered to return the shares already transferred to him and to Serena Truman, together with the $23,000 in money which had been paid to him, and demanded the retransfer to him of the bond and mortgage. These offers were repeated in the pleadings in the actions before us, and were made good upon the trial.

It was a disputed question upon the trial whether the final consummation and execution of the agreement was made subject to the condition that an examination of the bank by the respondent, to be made upon his return from Europe, should disclose its condition to be substantially as represented by the appellant. The respondent testified that such was the agreement, and in this he was corroborated by other witnesses. The court found that such condition was attached to the contract, and was a part thereof, and that it was orally agreed that, in the interval between the transfer of the bond and mortgage and the return of said Truman from Europe, the said bank should continue business under the management of the appellant, and that he should remain liable and responsible for its condition, and subject to all liability upon the capital stock thereof. It is quite certain that the question as to who should be responsible for the management of the bank during the respondent's absence, and upon whom should fall any loss that should happen to it during that period, was a subject of discussion between the parties, in the negotiations on February 1st and prior thereto; and the finding of the court has ample support in the testimony contained in the record before us. No objection is now made by the appellant that such an oral condition attached to the contract was not lawful, or that it tended in any way to vary or contradict the terms of the written agreement. Without referring in detail to the testimony, we are of the opinion that the evidence in the record amply sustains the conclusions of the trial court upon all of the facts which were essential to the relief sought by the respondent. The testimony was conflicting to the degree that it is beyond reconciliation upon any view of the case that it is possible to take, and it was the province of the trial court to determine which party was entitled to be believed, and which version of the transaction had the support of the evidence; and, after a very careful consideration of the facts, we find no reasons to disagree with the conclusions reached by the trial judge.

When the respondent visited Wichita in the month of April, 1894, he took with him Mr. Charles Davis, who was at that time the receiver of the Elmira National Bank, and who went with the respondent with the consent of the comptroller of the currency, for the purpose of examining into the condition of the Wichita bank. Mr. Davis was sworn as a witness upon the trial in behalf of the respondent, for the purpose of proving that at the time of the agreement the bank was insolvent, and he was permitted to testify, against the appellant's objection and exception, to conversations which he had with the bank's officers and with the bank's attorney in reference to its assets; and what these officers told him about

the condition of the assets at the time of his visit and examination in April, 1894. There are many objections in the record to questions which Mr. Davis in answering was permitted to testify to statements of such officers, all of which were overruled by the court, and to which ruling the appellant excepted. We are of the opinion that testimony of this character was clearly inadmissible, and that all of the objections to which I have referred were well taken, and should have been sustained; and, if the testimony thus introduced into the case is vital to the respondent's recovery, then the judgments must be reversed. In my opinion, however, the errors which the court committed in allowing this testimony are not fatal to the judgments. A judgment will not be reversed for error in the admission of testimony, when the court is satisfied, upon an examination of the whole case, that the appellant has not been prejudiced thereby. Forrest v. Forrest, 25 N. Y. 510; People v. Gonzalez, 35 N. Y. 59; McGean v. Railway Co., 117 N. Y. 219, 22 N. E. 957. An examination of the record before us discloses that the testimony of Mr. Davis which was improperly admitted is not at all necessary to the support of either judgment appealed from. It was essential, of course, to the respondent's case, to show that the representations, which he alleged were the inducement to enter into the contract, were false; but this burden did not necessarily require of him that he should show the condition of the bank on February 1, 1894. Upon the condition which was attached to the contract, to which I have already alluded, it was essential to the appellant's right to have the contract fulfilled that it should appear, at the time when Truman should examine the bank, that its condition was substantially as the appellant had represented it to be at the time the contract was made. This condition related, not to the date of the agreement, but to the time of the examination; and if we reject entirely all the testimony given by Mr. Davis over the objection of the appellant, there is ample left in the case which is absolutely unobjectionable and uncontradicted to sustain the conclusion that the falsity of the representations was substantially shown, and the condition alluded to was not fulfilled. The respondent and Mr. Davis arrived in Wichita on April 15, 1894. From the examination of the bank then made, it appeared that it held nearly $100,000 of overdue paper, that it had made no new loans for the preceding six months, and that it had done no new business of any kind for the preceding three or four months. Its officers were then engaged in collecting, so far as they could, moneys due to it, borrowing upon its live paper as much as it was possible to do, and paying off its depositors. In other words, the bank was not at that time an active business institution, but was engaged in the process of liquidation. Within less than a month after this examination the bank announced its insolvency, and passed into the hands of a receiver, and the result of his administration upon its assets was that it was ascertained that its surplus and capital stock were wholly lost, and its stockholders were called upon to pay an assessment upon the stock of 100 per cent. How much further than this the assets had shrunk, or what was the actual final loss

to the depositors, the case does not inform us. It would be a serious strain on any person's credulity to ask them to believe, in the face of this testimony, that the bank, on February 1, 1894, was a sound financial institution, earning 12½ per cent. upon its capital stock, which stock, by reason of the large surplus held by the bank, had a value of $200 per share. If there was, however, any doubt left, upon this evidence, as to whether the bank was insolvent when the contract between the parties was made, or as to whether or not that fact was known to the appellant, we have only to refer to the letter which the appellant, on May 7, 1894, wrote to Mr. R. E. Pairo, an attorney at law, residing in the city of Washington. This letter, written when the bank was about passing into the hands of the receiver, leaves no doubt that the defendant, during the year 1893, from the reports made to him by his son as to the condition of the bank, knew that very large sums had been loaned to the directors and their friends upon unsecured or insufficiently secured notes, and that it was seriously embarrassed, and needed financial assistance and careful management to ward off impending failure. When this information was imparted to the appellant, he threatened to resign the office of president, but so delicate was the situation at that time that he was told by the directors that to do so would "break the bank." He then demanded that the notes of the directors and their friends should be secured, and, when this was not done, he states he determined to sell his stock, and placed it for sale in the hands of several brokers, among whom was the son who conducted the trade with the respondent, and who had examined the bank in 1893, and imparted the information referred to to his father. Substantially the same information which the appellant had received from his son had been communicated to him by the deputy comptroller of the currency, in a letter addressed to him as president of the bank, under date of November 28, 1893. In that letter he was informed that an examination of the bank, made on the 13th of that month, had disclosed loans made to the directors and other officers in excess of the limit prescribed by law; that the overdue paper amounted to $166,478, of which $95,467 was classed as bad debts; that money had been borrowed of other banks, which, instead of being classed as bills payable, was treated as deposits, for which certificates of deposit had been issued; that the capital of the bank was impaired; and that no dividends could be declared by the bank until all the losses had been charged off. There is but one conclusion possible from this testimony, and that is that the failing condition of the bank was known to the appellant and his son during the year 1893, and that it was because of impending insolvency that the appellant concluded to sell his stock; and all the representations made as to the character and business of the bank, and which were the inducements to the respondent to become the purchaser of that stock, were untrue. It does not require us, in order to reach this conclusion, that we should give any weight or consideration to the improper testimony of Mr. Davis, which was admitted by the court over the appellant's objection. We may reject all of that testimony, and

the case will still present ample support for the conclusions of the trial judge.

It is the appellant's claim that the respondent knew of the condition of the bank, and that he agreed to accept the stock after the risk of failure had been fully disclosed to him. It was a disputed question whether the respondent ever saw the comptroller's letter. He testified that it never was shown to him, and the court was permitted to believe and adopt his testimony on that question, and we see no reason why we should reject it. He did see and read the letter of Skinner, the cashier, written in reply to the letter from the comptroller; but Skinner's letter did not inform that the surplus of the bank was impaired, or of the amount of overdue paper, or of the amount classed as bad debts. The only expression in Skinner's letter which referred in any way to the possible depletion of the surplus was the following:

"Our directors have been seriously considering the advisability of taking a part or all of the surplus and use it in charging off other than A1 assets."

While this expression was calculated to direct the attention of a careful and prudent man to the fact that the bank had met with losses, it did not necessarily indicate that the surplus was absolutely lost, or that the capital of the bank was impaired; and that it did not have that effect upon the respondent is evident from his letter to the appellant's son, written on January 31st, in which he says:

"In this matter of exchange, I have explained to the trustee that I rely more on you and your father, in what you say as to the present and probable future of the bank, than on any statement of officers or examiners."

Much stress is laid by the appellant upon the eliminations made by his son from this letter, and the striking out of the expression that the respondent understood that the condition of the bank had improved since the date of the comptroller's letter. There is nothing in the erasures from this letter which is conclusive upon the question of the respondent's knowledge of the condition of the bank. All that can be said of it is that it was testimony which tended to sustain the appellant's claim. It was subject to explanation, and was explained by the respondent. He testified to many statements made by the appellant's son, which, if true, supported his claim that he was induced to believe that the condition of the bank had improved since the date of the comptroller's letter; and the conclusion was permissible that he relied upon such statements rather than upon the statements of the examiner or cashier.

Upon the whole case, we find no reason to reverse the conclusion reached at the trial, and the judgments must be affirmed, with costs. All concur.